**In the Matter of YALE EXPRESS SYSTEM, INC., Debtor.**

**Application of FRUEHAUF CORPORATION.**

United States District Court
S. D. New York.
Jan. 25, 1966.

■■■■■■■■■■■■■■■■

Conboy, Hewitt, O'Brien & Boardman, by Marvin F. Hartung and Myron D. Cohen, New York City, for petitioner Fruehauf Corporation.

Royall, Koegel & Rogers, by William R. Glendon and David Bernstein, New York City, for trustee.

TYLER, District Judge.

Fruehauf Corporation here applies for reclamation of fifty trailers and sixty-two truck bodies, currently in the possession of the trustee for Yale Express System, Inc. and its subsidiaries, debtors in reorganization.

At various times in the summer and fall of 1964, Yale purchased these trucks and trailers from Fruehauf at a total cost of $379,208.50. Cash payment was to be made 30 days after delivery of each unit of truck bodies and 90 days after delivery of each unit of trailers.

Fruehauf claims that during the relevant period in 1964 it was advised through information furnished by the mercantile reporting agency, Dun & Bradstreet, Inc. ("D & B") that Yale was in good financial condition [1] and that it was on the basis of this information that it extended credit to Yale.

In February, 1965, Fruehauf was informed by representatives of Yale that that company's financial statements issued during 1964 were inaccurate; specifically, that instead of having a net profit in excess of a million dollars, Yale actually had sustained a net loss for 1963. Upon receiving this information, Fruehauf took the position that it had the right to reclaim the trailers and truck bodies sold to Yale. After negotiations between Yale and Fruehauf, an agreement was entered into on March 26, 1965 by these two companies in which Fruehauf agreed to waive its asserted right to reclaim the trailers and trucks and to permit Yale to pay for them on an installment basis. In turn, Yale gave Fruehauf a security interest (in the form of chattel mortgages) on the trailers and truck bodies. The chattel mortgages were duly executed and filed in accordance with the New York Uniform Commercial Code.

Two months later, on May 24, 1965, Yale filed a petition for reorganization under Chapter X of the Federal Bankruptcy Act.

The terms of the chattel mortgages required installment payments to be made once a month and to continue until 1970. Fruehauf asserts that Yale only made two payments, the March and April, 1965 payments. On October 11, 1965, Fruehauf made a formal demand upon the trustee for the immediate possession of the collateral described in the chattel mortgages. The trustee then refused and has continued to refuse to release the collateral.

Fruehauf appears to offer two grounds to support its foreclosure petition. First,

---

1. More specifically, Fruehauf contends that as a subscriber thereof, it received a report from D & B, dated June 9, 1964, which purportedly contained a financial statement of Yale for the year of 1963, prepared by Peat, Marwick, Mitchell & Company. The statement, according to Fruehauf, listed Yale's net income for 1963 as in excess of one million dollars. Further, according to Fruehauf, the D & B report stated that Yale's aggregate of cash and receivables well exceeded its total current liabilities.

it contends that the chattel mortgages provide for repossession of all collateral upon the election of the mortgagee where there has been a default in making installment payments. Second, it is said that the chattel mortgages give the mortgagee the right to foreclose when a petition for reorganization of the mortgagor under the Bankruptcy Act has been filed.

 The fact that Yale is currently undergoing reorganization pursuant to Chapter X of the Bankruptcy Act raises some fundamental questions as to the principles governing reclamation. In the context of reorganization proceedings, the general rule is said to be that reclamation will be granted against a debtor if the petitioner is able to show that the property he seeks to reclaim belongs to him. In re Lake's Laundry, 79 F.2d 326 (2d Cir. 1935); In re White Plains Ice Service, 109 F.2d 913 (2d Cir. 1940); In re Newjer Contracting Co., 154 F.Supp. 567 (D.C.N.J.1957); In re Sun Cab Co., 67 F.Supp. 137 (D.C.D.C.1946). Further, courts have been fairly consistent in holding that where the petitioner only has a lien on or interest in, as distinguished from title to, the property sought to be reclaimed, the reorganization court can deny the reclamation if such relief, in the court's opinion, would jeopardize the reorganization. In re United States Realty & Improvement Co., 153 F.2d 853 (2d Cir. 1946); Lincoln-Alliance Bank & Trust Co. v. Dye, 108 F.2d 38 (2d Cir. 1939); In re Prudence-Bonds Corp., 77 F.2d 328 (2d Cir. 1935); see also In re Lake's Laundry, supra, 79 F.2d at 327–328.

Crucial, therefore, to a successful petition for reclamation against a debtor in reorganization is a sufficient showing that the goods and chattels to be reclaimed are the property of petitioner and not that of the debtor. Support for this proposition can be found in certain sections of the Bankruptcy Act which give the trustee almost exclusive control over the property of the debtor.[2]

 Assuming that Fruehauf has a valid security interest therein, it nevertheless will not be entitled to reclaim the trucks and trailers unless it can show that the trucks and trailers are not the "property of the debtor". Fruehauf,

2. The three sections of the Bankruptcy Act which deal with the power of the reorganization court over the property of the debtor are §§ 116(4), 148, 257.

Section 116(4) states: "Upon the approval of a petition, the judge may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon him and the court—in addition to the relief provided by Section 11 of this Act, enjoin or stay until final decree the commencement or continuation of a suit against the debtor or its trustee or any act or proceeding to enforce a lien upon the property of the debtor."

On June 2, 1965 an order was entered in this case pursuant to § 116(4) of the Bankruptcy Act. The exact language of this order is as follows: "14. Until final decree or the further order of this court, all creditors and stockholders, all sheriffs, marshals and other officers, and their respective attorneys, servants, agents and employees, and all other persons, firms and corporations be, and they are, jointly and severally, enjoined and stayed from commencing or continuing any action at law or suit or proceeding in equity against said debtor or said trustee in any court, or from executing or issuing or causing the execution or issuance out of any court of any writ, process, summons, attachment, subpoena, replevin, execution or other process. For the purpose of impounding or taking possession of or interfering with or enforcing a lien upon any property owned by or in the possession of the said debtor or said trustee, and from doing any act or thing whatsoever to interfere with the possession or management by said debtor or said trustee of the property and assets of the within estate, or in any way interfere with said trustee in the discharge of his duties herein, or to interfere in any manner during the pendency of this proceeding with the exclusive jurisdiction of this court over said debtor and said trustee and their respective properties; and all persons, firms or corporations owning any lands or buildings occupied by said debtor or said trustee or wherein is contained any property of the within estate be, and they hereby are, jointly and severally, stayed, pending the further order of this court, from removing or interfering with any such property."

arguing that this court must look to state law to determine the latter question, maintains that under applicable provisions of the New York Uniform Commercial Code [3] it obtained by the chattel mortgages of March 26, 1965 all the rights of a holder of a purchase-money security interest [4]. Thus, according to Fruehauf, when in February, 1965 Yale representatives conceded to Fruehauf that Yale had sustained losses rather than profits for 1963, this effectively constituted an impairment of Fruehauf's security and gave the latter the right to immediate possession of the collateral under the repossession provision of the Uniform Commercial Code.[5] The main thrust of Fruehauf's argument is that under the statute, as long as the creditor has a perfected security interest in the personal property, the fact that title is in the debtor is of no moment. In support of this, Fruehauf points to Section 9–202 of the Code which states: "Each provision of this Article with respect to rights, obligations, and remedies applies whether title to collateral is in the secured party or in the debtor."

After carefully examining Fruehauf's contentions, I find that I am unable to agree with them. To begin with, Fruehauf's reliance upon Section 9–202 is misplaced, or, perhaps more accurately, Fruehauf reads more into that section than is sensible in the light of the Uniform Commercial Code as a whole. Section 9–202 merely gives the holder of a valid security interest all of the rights, obligations and remedies *which are provided by the Code itself,* and none of the Code provisions, separately or when read together, give a holder of a chattel mortgage (or purchase-money security interest) the right to reclaim collateral from a debtor in Chapter X proceedings. More particularly, Section 9–202 only becomes helpful to petitioner when it is read together with Section 9–503.[6] The latter provision gives a secured creditor the right to proceed after default either without judicial process under peaceful circumstances or "by action" in a court of competent jurisdiction. Clearly, the words, "by action", refer to some procedural process provided by the state, exclusive of the Code, whereby a person entitled to property may recover, such as an action for replevin.[7] There is, of course, no special procedure spelled out in the New York Uniform Commercial Code for recovery by a secured party of his collateral upon default by the debtor. Creditors such as Fruehauf must look to remedies available out-

---

3. The Uniform Commercial Code became effective in New York on September 27, 1964.

4. The term, "purchase money security interest" is defined in Section 9–107 of the New York Uniform Commercial Code: "A security interest is a 'purchase money security interest' to the extent that it is
 (a) taken or retained by the seller of the collateral to secure all or part of its price; or
 (b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."

5. Section 9–503 of the N.Y.U.C.C. states in part "unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. * * *"

6. Ibid.

7. Spivack in his book on Secured Transactions, at 134 says: "Section 9–503 provides that, unless otherwise agreed, after default, a secured party has the right to take possession of the collateral. * * * As Section 9–503 sets forth the secured party's legal right to possession, it would appear that the secured party would be entitled to proceed by way of replevin in order to accomplish possession. In any jurisdiction where there is doubt as to what judicial process is available to a secured party seeking to possess collateral, this should be spelled out in the practice statutes or in the rules of court as was done in Pennsylvania. In Pennsylvania there was added to Section 9–503 the proviso: 'If a secured party elects to proceed by process of law, he may proceed by writ of replevin or otherwise.'"

side the Code, and a reclamation petition before the reorganization court is one such—indeed the only practicable one in view of this court's stay order of June 2, 1965. To say this, however, is to indicate that Fruehauf is now back where it started for the simple reason that, as heretofore indicated, a condition precedent to reclamation in a Chapter X proceeding is the ability of the petitioner to show that he has title to the property in question.

 Fruehauf's reliance upon the Uniform Commercial Code is faulty for still another reason. Conceding *arguendo* that Fruehauf has a valid purchase money security interest in the trucks and trailers, this interest still only amounts to a lien for the purposes of reclamation. Perfection of the type of security interest held by Fruehauf is accomplished, of course, by: (1) creation of a security agreement between the parties; and (2) filing, in the appropriate place, of a financing statement plus the security agreement. The security interest is created by the security agreement. Whether this interest becomes perfected depends on whether the parties comply with the Code requirements for perfection. Thus, to determine what interest Fruehauf has in the collateral in question, this court must look to the underlying security agreement. The security agreement between Fruehauf and Yale is entitled, "chattel mortgage", and more importantly is contained on a standard chattel mortgage form. Consequently, irrespective of New York's adoption of the Uniform Commercial Code [8] the basic security agreement between the parties establishes unequivocally that Fruehauf intended to procure only a lien upon the trucks and trailers as security for Yale's outstanding debt.

 Interestingly, Fruehauf's contentions are further weakened if one considers that the sole real distinction between a conditional sales contract and a chattel mortgage is the time of passage of title. In the case of a conditional sale, it seems that the delay in the passage of title is significant only insofar as it provides the vendor with a speedier and more certain method of realizing on the security for his debt. Obviously, the vendor's fundamental purpose is recovery of the purchase price; the optional remedy of reclamation of the goods merely facilitates the liquidation of the claim. But a distinction devised to facilitate liquidation should scarcely be made operative under a statute the central purpose of which is not liquidation but rehabilitation of a corporation. See In re Lake's Laundry, 79 F.2d 326 at pages 328–329 (2d Cir. 1935) (dissent by J. Hand).

 Yet since this court must follow the still viable appellate decisions in point, the distinction between a chattel mortgage and a conditional sale must remain operative for the purpose of determining what property is "property of the debtor".

 Having determined from the underlying transaction and the documents evidentiary thereof that the trucks and trailers belong to Yale and are the "property of the debtor", reclamation must be

---

8. There seems to be little doubt that the Uniform Commercial Code was not intended to supersede the Federal Bankruptcy Act. The 1956 Report of the Law Revision Commission, entitled "Report Relating to the Uniform Commercial Code" stated at p. 104:
"It is undoubtedly the intent of the Code that the rights of secured creditors be subject to the operation of insolvency laws to the same extent as heretofore. Although there is implicit recognition of it in several sections, including Sections 9–104 (j), 9–301(3), 9–306(3), as amended, 9–507(2) and, perhaps, 9–201, though the Comment to the last mentioned section suggests that the intent thereof is to insure the preservation of small loan and retail installment selling acts rather than insolvency statutes. It is incredible that any court would ever construe the default provisions of Code Article 9 as over-riding any provisions of existing assignment or insolvency statutes (cf. Comment 1 to § 9–507, second paragraph). It will be hereinafter assumed, therefore, that the rights of secured creditors under the Code would be subject, in general, to being affected by operation of constitutionally valid insolvency laws."

denied. A district court which sits as a reorganization court is a court of bankruptcy and thus a court of equity. Young v. Higbee Co., 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945). There are cogent equitable reasons why Yale should not be forced to give up possession of this property at this time. One immediate result of forced dispossession of the Fruehauf manufactured equipment would be the requirement that Yale purchase new replacement units. Its existing older units in storage are obsolescent and inefficient. Usage of the latter would mean greater maintenance costs and, more important, loss of cutomers which cannot effectively be served by such ancient equipment. Any such increased expense with concomitant loss of revenues could well mean the difference between successful reorganization and forced liquidation. The whole objective of Chapter X is "to avoid immediate liquidation of the properties involved in the reorganization of a corporation * * * with a view to rehabilitate rather than to liquidate." Matter of Island Park Associates, Inc., 77 F.2d 334 (2d Cir. 1935).

The petition is denied. It is so ordered.